## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 24 2019, 8:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
PFISTER AND SOPKO

Greg A. Bouwer
Jeff Carroll
Koransky Bouwer & Poracky, P.C.
Dyer, Indiana

ATTORNEY FOR APPELLEE OHIO
FARMERS

Stephen C. Wheeler
Smith Fisher Maas Howard &
Lloyd, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| State of Indiana *ex rel.* Curtis T. Hill, Attorney General of Indiana, <br><br> *Appellant-Plaintiff*, <br><br> v. <br><br> William J. Pfister, Richard A. Sopko, Travelers Insurance Companies, Western Surety | June 24, 2019 <br><br> Court of Appeals Case No. 18A-PL-771 <br><br> Appeal from the Lake Circuit Court <br><br> The Honorable Marissa J. McDermott, Judge <br><br> Trial Court Cause No. 45C01-1705-PL-51 |

Insurance Company, and Ohio
Farmers Insurance Company,

*Appellees-Defendants.*

**Brown, Judge.**

[1] The State of Indiana *ex rel.* Curtis T. Hill, Jr., Attorney General of Indiana (the "State") appeals the trial court's entry of summary judgment in favor of William J. Pfister, Richard A. Sopko, and Ohio Farmers Insurance Company ("Ohio Farmers"). The State raises several issues which we consolidate and restate as whether the court erred in entering summary judgment. We affirm.

### Facts and Procedural History

A. *Background*

[2] This appeal stems from a complaint brought by the State against Pfister and Sopko, officials of the School Town of Munster, Lake County (the "School Town"), and Ohio Farmers,[1] pursuant to Ind. Code § 5-11 *et seq.*, seeking to recover funds related to allegations of "malfeasance, misfeasance, and/or nonfeasance on the part of Pfister and Sopko" occurring from July 1, 1999, to June 30, 2014. Appellant's Appendix Volume II at 47.

---

[1] The State also sought recovery from parties that do not participate in this appeal.

1. *Pfister's Contracts*

[3] From July 1, 1999, through February 1, 2009, the School Town entered into twelve Superintendent's Contracts with Pfister that contained provisions for various fringe benefits. Pfister's contracts from 1999 to 2003 were signed by the President and Secretary of the Board of School Trustees (the "Board"), and his contracts from 2004 to 2009 were signed by the President, Vice President, Secretary, and two members of the Board.[2]

[4] Pfister's contracts from 1999 to 2000 stated that the School Town shall pay his "annual contribution to the Indiana State Teachers['] Retirement Fund."[3] Appellant's Appendix Volume III at 69, 74, 80. The June 27, 2001 contract stated that it shall pay his "annual contribution to the Indiana State Teachers['] Retirement Fund, plus an additional 2% toward his Indiana Teacher Retirement Fund." *Id.* at 85. The June 27, 2002 contract stated that it shall pay his "annual contribution to the Indiana State Teachers['] Retirement Fund, plus

---

[2] According to the version of the School Town's Bylaws and Policies which was designated in support of Pfister and Sopko's summary judgment motion, the Board consists of five members and serves as the governing body for, and conducts the supervision of, the School Town, which is a body corporate capable of suing and being sued. The Board exercises executive power by appointing the Superintendent and annually "evaluate[s] the performance of the Superintendent." Appellant's Appendix Volume III at 60. As an outcome of the evaluation of the Superintendent's performance, the Board "judge[s] the advisability of retention of the Superintendent" and is better prepared to "determine the Superintendent's advisory and benefit package." *Id.* at 61. Further, the School Town's Bylaws and Policies provide that, "[i]f the services of the superintendent are found to be unsatisfactory to the Board, the Superintendent shall be notified in writing by the President, as approved by the Board, that his/her contract will expire upon the expiration date set forth in the contract." *Id.* at 62.

[3] Two Superintendent's Contracts, dated June 21 and October 20, 2000, contain the same relevant language as the July 1, 1999 contract.

each year an additional 2% toward an annuity of his choice." *Id.* at 91. The June 27, 2003 contract stated that it shall pay his "annual contribution to the Indiana State Teachers['] Retirement Fund, plus each year an additional 4% toward an annuity of his choice." *Id.* at 97. The language from Pfister's 2003 contract appeared in each of his contracts from 2004 to 2009.

### 2. *Sopko's Contracts*

[5] From July 1, 1998, through July 1, 2011, the School Town entered into fourteen Assistant Superintendent's Contracts with Sopko,[4] and on July 1, 2012, it entered into a Superintendent's Contract with him that provided that he would "devote his entire time and energy to his duties as . . . Superintendent." *Id.* at 207. Each of Sopko's contracts contained provisions for various fringe benefits, his contracts from 1998 to 2005 were signed by the President and Secretary of the Board, and his contracts from 2006 to 2012 were signed by the President, Vice President, Secretary, and two members of the Board.

[6] Sopko's contracts from 1998 to 2000 stated that the School Town shall pay his "annual contribution to the Indiana State Teachers' Retirement Fund." *Id.* at 138. His June 27, 2001 contract stated that it shall pay his "annual contribution to the Indiana State Teachers' Retirement Fund, plus an additional 2% toward

---

[4] According to the School Town's Bylaws and Policies which Pfister and Sopko designated, the assistant superintendent is considered an administrator, and the Board "approve[s] the employment, fix[es] the compensation and establish[es] the term of employment for each administrator." Appellant's Appendix Volume III at 63. Further, the Board "give[s] written notice of renewal or refusal to renew" an assistant superintendent's contract. *Id.* at 65.

his Indiana Teacher Retirement Fund." *Id.* at 151. His June 27, 2002 contract stated that it shall pay his "annual contribution to the Indiana State Teachers' Retirement Fund, plus each year an additional 2% toward an annuity of his choice." *Id.* at 156. His June 27, 2003 contract stated that it shall pay his "annual contribution to the Indiana State Teachers' Retirement Fund, plus each year an additional 3% toward an annuity of his choice." *Id.* at 161. The language from Sopko's 2003 contract appeared in each of his contracts from 2004 to 2011, and his 2012 superintendent's contract does not mention annuity contributions in the section detailing fringe benefits.

### 3. *Accounts Payable Vouchers and Voucher Registers*

In November 2003, the School Town's Director of Financial Operations and Treasurer, Janice Swanson, signed an Accounts Payable Voucher for the School Town that reported that school year's initial deposit to pension bond funds to payee "Valic" for "Group #1456, 401A Account, CS3-Plan 2, Subgroup #1 (William Pfister & Richard Sopko)." Appellant's Appendix Volume III at 217. Each year from 2004 through 2013, she signed an Accounts Payable Voucher that reported an amount for that school year's employer retirement contribution to payee "Valic" for "Group #1456, 401A Account, CS3-Plan 2, Subgroup #1 - William Pfister & Richard Sopko." *Id.* at 222. *Accord id.* at 227, 232, 237, 243, 248; Appellant's Appendix Volume IV at 5, 11, 17, 23. In 2014, she signed an Accounts Payable Voucher for that school year's employer retirement contribution to payee "Valic" for "Group #1456, 401A Account, CS3-Plan 2, Subgroup #1 for Richard A. Sopko." *Id.* at 29. On each of the 2003-2014

Vouchers, Swanson's signature appears below the statement, "I hereby certify that the attached invoice(s), or bill(s), is (are) true and correct and I have audited same in accordance with IC 5-11-10-1.6."[5] Appellant's Appendix Volume III at 217. *Accord id.* at 227, 232, 237, 243, 248; Appellant's Appendix Volume IV at 5, 11, 17, 23, 29.

[8] At each regular meeting held in June of the School Town's Board, from 2000 until 2004, from 2006 until 2007, and from 2009 until 2013, the Board approved, by motion, an Accounts Payable Voucher Register that had been "hand delivered to each [Board] member before the public meeting that was held to approve them."[6] Appellant's Appendix Volume III at 214. Documents titled "Accounts Payable Voucher Register," which stated "We have examined the vouchers on the foregoing Accounts Payable Voucher Register consisting of ___ pages and, except for vouchers not allowed as shown on the register, such vouchers are hereby allowed in the total amount of . . . ," were signed by the President, Vice President, Secretary, and two members of the Board, and approved each year from 2003 to 2014. *Id.* at 216. *Accord id.* at 221, 226, 231, 236, 242, 247; Appellant's Appendix Volume IV at 4, 10, 16, 22, 28.

---

[5] Ind. Code § 5-11-10-1.6 (2003) provided that the "fiscal officer of a governmental entity may not draw a warrant or check for payment of a claim unless . . . the fiscal officer audits and certifies before payment that the invoice or bill is true and correct." (Subsequently amended by Pub. L. No. 1-2005, § 78 (eff. July 1, 2005); Pub. L. No. 169-2006, § 4 (eff. July 1, 2006); Pub. L. No. 182-2009(ss), § 77 (eff. January 1, 2010).

[6] In 2005, according to the June 6 minutes of a Regular Board Meeting, the Accounts Payable Voucher was "presented at Special Board Meeting on June 10, 2005." Appellant's Appendix Volume V at 209. The record does not contain a copy of the minutes of June 20, 2005 Special Board Meeting.

### 4. *The Ohio Farmers' Policies*

[9] On or about July 1, 1997, Ohio Farmers issued Policy No. CBP 5634356 ("Policy No. 1") to the School Town. Policy No. 1 indicated that the policy period was from July 1, 1997, to July 1, 2000, and stated the policy "Consists Of The Following Coverage Parts: Commercial Crime Coverage Part." Appellant's Appendix Volume II at 182. In the "General Conditions" subsection under the Crime General Provisions, it states "**Discovery Period for Loss**: We will pay only for covered loss discovered no later than one period from the end of the policy period." *Id.* at 192. Ohio Farmers did not renew Policy No. 1.

[10] On July 1, 2002, Ohio Farmers issued Policy No. 5260158 ("Policy No. 2") to the School Town. Policy No. 2 indicated the policy period was from July 1, 2002, to July 1, 2005, and stated that the policy "Consists Of The Following Coverage Parts: Commercial Crime Coverage Part." *Id.* at 220. In the "General Conditions" subsection under the "Crime General Provisions (Loss Sustained Form)," it stated "**Extended Period to Discover Loss**: We will pay only for covered loss discovered no later than 1 year from the end of the Policy Period." Exhibit IX at 17-18. *Accord id.* at 46-47, 78-79.

[11] On July 1, 2005, Ohio Farmers issued a renewal of Policy No. 2 ("Policy No. 2 Renewal") for the period from July 1, 2005, to July 1, 2008, to the School Town. Policy No. 2 Renewal contains the same statements regarding the "Extended Period to Discover Loss" as Policy No. 2. Ohio Farmers did not

renew Policy No. 2 Renewal at its expiration on July 1, 2008. Further, since the expiration of Policy No. 2 Renewal, Ohio Farmers "has not written an Employee Dishonesty policy" for the School Town. Appellant's Appendix Volume VIII at 158.

### 5. *State Board of Accounts' Biennial Audit Reports*

[12] Pursuant to Ind. Code § 5-11-1-9(a), the State Board of Accounts (the "SBOA") conducted regular biennial audit examinations of the School Town during the time period relevant to this appeal.[7] As part of the audit process, the SBOA requested that Pfister provide documents, including the Superintendent's and Assistant Superintendent's Contracts into which he and Sopko entered, and he did so. The SBOA issued six audit reports (collectively, the "Biennial Audit Reports"), each covering two-year increments and together spanning from July 1, 2001, to June 30, 2013. In an initial letter addressed to the School Town, each Biennial Audit Report stated:

> [W]e conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable

---

[7] The SBOA is tasked with "examin[ing] all accounts and all financial affairs of every public office and officer, state office, state institution, and entity." *See* Ind. Code § 5-11-1-9(a) (1999) (subsequently amended by Pub. L. No. 4-2005, § 25 (eff. February 9, 2005); Pub. L. No. 213-2007, § 2 (eff. July 1, 2007); Pub. L. No. 217-2007, § 2 (eff. July 1, 2007); Pub. L. No. 172-2011, § 12 (eff. May 10, 2011); and Pub. L. No. 280-2013, § 3 (eff. May 11, 2013)). Ind. Code § 5-11-1-16(c) (1993) provided that "public office" means "the office of any and every individual who for or on behalf of the state or any municipality . . . holds, receives, disburses, or keeps the accounts of the receipts and disbursements of any public funds," while subsection 16(a) provided that "municipality" means "any county, township, city, town, school corporation, special taxing district, or other political subdivision of Indiana." (Subsequently amended by Pub. L. No. 104-2014 (eff. March 25, 2014)).

assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinions.

Appellant's Appendix Volume IV at 41. *Accord id.* at 86, 125, 182, 231; Appellant's Appendix Volume V at 29.

B. *SBOA Special Investigation Report, the State's Complaint, and Subsequent Proceedings*

[13]   On July 24, 2015, Attorney Kathleen M. Maicher, representing the School Town, sent a letter to the Office of the Prosecuting Attorney of Lake County and the SBOA which indicated that, "[p]ursuant to Indiana Code § 5-11-1-27(j)," she wished to advise them of suspected misappropriation of School Town funds by then-former superintendents Pfister and Sopko and which referenced the "benefits and severance payments to be paid under the Superintendent's contract." Appellant's Appendix Volume IV at 32. The letter indicated in part that contracts for both administrators contained references to an "Annuity Starter 401(a)" and that Pfister proposed in 2000-2001 that the School Town pay him and Sopko an additional 2% toward their Indiana Teacher Retirement Fund and the Board agreed. *Id.* at 33. The letter also stated:

In the 2003-2004 school year contract, [Pfister] proposed raising [the School Town's] annuity contribution to 4% of his salary and

to raise [Sopko's] annuity to 3% of his salary and [the School Town] agreed. [Pfister and Sopko], however, interpreted the annuity starter clause to mean that **each year the stated percentage would be added to the figure from the prior year resulting in an ever increasing percentage that would be multiplied against their total salary to calculate the amount of their annuity payment**.

Most of the School Board members thought that the percentage identified in the contracts (i.e., 2% and later 4% for [Pfister] and 2% and later 3% for [Sopko]) would be a constant number multiplied each year against [Pfister's and Sopko's] increasing salary to calculate the amount of the Annuity Starter payment. The members were not informed of the exact amount of the annuity contributions.

The dramatic financial consequences of [Pfister's and Sopko's] interpretation of the contract were obvious. By the time they chose to retire, the multiplier against their salaries had increased to 42% and 36%, respectively.

*Id.* at 33-34.

On October 25, 2015, SBOA field examiner Karen Tetrault was assigned to investigate the School Town's financial records, books, accounts, and contracts from July 1, 1999, to June 30, 2014, due to suspected malfeasance, misfeasance, and/or nonfeasance. On June 8, 2016, the SBOA issued Special Investigation Report B46414 (the "Special Investigation Report"), based on an investigation limited to "Salary Contracts, Payroll Records and Annuity payments," and

referred it to the Indiana Attorney General's Office pursuant to Ind. Code § 5-11-5-1(a).[8] Appellant's Appendix Volume V at 137.

[15] On May 23, 2017, the State filed a Complaint to Recover Public Funds against Pfister, Sopko, Ohio Farmers, and others, alleging that the Special Investigation Report had "disclosed malfeasance, misfeasance, and/or nonfeasance on the part of Pfister and Sopko" and "was placed by the State Examiner with the Attorney General pursuant to Ind. Code § 5-11-5-1(a)." Appellant's Appendix Volume II at 47. Counts I and II of the Complaint allege: from 2001 to 2012, Pfister was wrongfully paid in excess of his contracted Annuity Starter in the total amount of $359,728.94 and, as a direct and proximate result of his multiple breaches of duty, the School Town suffered a pecuniary loss of $463,922.75; that, during the same period, Sopko was wrongfully paid in excess of his contracted Annuity Starter in the total amount of $311,198.75 and, as a direct and proximate result of his multiple breaches of duty, the School Town suffered a pecuniary loss of $377,475.28; and that the SBOA had incurred $10,053.32 of additional audit costs as a result of the breaches of duty of Pfister and Sopko. Counts III and IV seek treble damages in the amount of $1,391,768.25 from Pfister and $1,132,425.84 from Sopko, respectively, and state that the State was a party suffering a pecuniary loss and "on behalf of the

---

[8] Ind. Code § 5-11-5-1(a) (2016) provided in relevant part that, if an examination made under the article "discloses malfeasance, misfeasance, or nonfeasance in office or of any officer or employee, a copy of the report, signed and verified, shall be placed by the state examiner with the attorney general and the inspector general." Subsequently amended by Pub. L. No. 188-2016, § 5 (eff. July 1, 2016).

School Town" was entitled to the relief described in Ind. Code § 34-24-3-1.[9] *Id.* at 56-57. Count VII alleges that three crime insurance policies covering Pfister provided "$5,000 in coverage from July 1, 1997 to July 1, 2000, $5,000 in coverage from July 1, 2002 to July 1, 2005, and $5,000 in coverage from July 1, 2005 to July 1, 2008," and that, as a result of Pfister's actions, Ohio Farmers was jointly and severally liable in the amount of $15,000.[10] *Id.* at 61. The State attached copies of Policy Nos. 1 and 2 and Policy No. 2 Renewal to the Complaint.

[16] On October 26, 2017, Pfister and Sopko filed a motion for summary judgment and designated the School Town's Bylaws and Policies; Pfister and Sopko's superintendent and assistant superintendent contracts, the attendant Accounts Payable Voucher Registers for the School Town, and an Affidavit of Business Records Custodian For Authenticating Written Documents Relating to Docket Voucher Registers by Swanson; the SBOA's Biennial Audit Reports; the SBOA's Special Investigation Report; and the minutes of regular meetings held in June of the School Town's Board from 2000 until 2007 and from 2009 until

---

[9] Ind. Code § 34-24-3-1 (2011), which is often referred to as the Crime Victims Relief Act and is titled "Pecuniary loss as result of property offenses," provides in part that a person, with "an unpaid claim on a liability that is covered by IC 24-4.6-5" or who "suffers a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9," may bring a civil action for: "[a]n amount not to exceed three (3) times . . . the actual damages of the person suffering the loss," "[t]he costs of the action," "[a] reasonable attorney's fee," and "[a]ll other reasonable costs collection." Subsequently amended by Pub. L. No. 276-2019, § 1 (eff. July 1, 2019).

[10] The initial complaint named defendant Westfield Companies in Count VII. **(61)** An entry in the chronological case summary dated August 7, 2017, states "Order dated 07-31-17, Court Grants order Suibstitution [sic] [Ohio Farmers] for Westfield Companies As the Real Party Defendant In Interest For Count VII of Complaint." Appellant's Appendix Volume II at 13.

2013. The Accounts Payable Voucher Registers included copies of checks from the School Town payable to Valic and the School Town's Accounts Payable Vouchers. The records contained in the Account Payable Voucher Register for 2007 included a document titled "Annuity Contribution to Valic for Superintendent and Assistant Superintendent Per Supplemental Contracts" and states that the "Employer Contribution Pension Accounts" for Pfister was "22% of Salary[,] $164,440 x .22 = $36,177" and for Sopko was "18% of Salary[,] $137,766 x .18 = $24,798." Appellant's Appendix Volume III at 238. Additional records contained in the Account Payable Voucher Register further indicate that the employer contribution to pension accounts for Pfister was "30% of Salary[,] $177,964 x .30 = $53,389" in 2009, "34% of Salary[,] $182,888 x .34 = $62,182" in 2010, "38% of Salary[,] $177,501 x .38 = $67,450" in 2011, and "42% of Salary[,] $178,101 x .42 = $74,802" in 2012; and for Sopko was "24% of Salary[,] $152,747 x .24 = $36,659" in 2009, "27% of Salary[,] $156,806 x .27 = $42,338" in 2010, "30% of Salary[,] $152,619 x .30 = $45,786" in 2011, "33% of Salary[,] $154,643 x .33 = $51,032" in 2012, and "36% of Salary[,] $155,243 x .36 = $55,887" in 2013.[11] *Id.* at 249; Appellant's Appendix Volume IV at 6, 12, 19, 24.

[17] Also on October 26, 2017, Ohio Farmers filed a Motion for Partial Summary Judgment Against Count VII of the Complaint and, in support of its motion, a

---

[11] The Account Payable Voucher with an invoice date of "2/15/2013" indicates that Sopko's employer retirement contribution for 2012-2013 was "$55,887.00." Appellant's Appendix Volume IV at 23.

Notice of Filing Discovery Request and Discovery Response that contained the State's responses to Ohio Farmers' first set of interrogatories. The State's answer to Question 2(e) references a "four (4) page e-mail stream," attached to the first set of interrogatories as Exhibit 1, and states that "the e-mails accurately set forth [the State's] position that the loss [set forth in Complaint VII] was discovered by the School Town in June/July 2015; however, the loss was not discovered by [the State] until [the Special Investigation Report] was issued on June 8, 2016." Appellant's Appendix Volume VIII at 139.

[18] On November 16, 2017, Pfister and Sopko filed a Motion to Compel and requested that the State produce the notes and paperwork associated with the Biennial Audit Reports. On November 22, 2017, the State filed a response in opposition to Ohio Farmer's motion for partial summary judgment, and on November 28, 2017, it filed a response in opposition to Pfister and Sopko's motion for summary judgment. On December 8, 2017, the State filed a response in opposition to Pfister and Sopko's motion to compel, in which it indicated that the work papers and notes accompanying four of the Biennial Audit Reports had been destroyed "pursuant to the Records and Retention Schedule" and were no longer in existence and argued that Pfister and Sopko's document requests would require the State to "spend hundreds of exhaustive hours compiling and preparing work papers for prior SBOA audit reports clearly irrelevant to the present matter." Appellant's Appendix Volume VI at 185.

On January 25, 2018, the court held a hearing on the summary judgment motions and entered a Miscellaneous Order that set Pfister and Sopko's motion to compel for a hearing and required the State to bring to the hearing a "detailed privilege log as well as copies of the responsive documents it has not produced so that the court may conduct an *in camera* inspection of the same." Appellant's Appendix Volume X at 198.

On March 27, 2018, the court entered an order granting summary judgment in favor of Pfister as to the treble damages claim and as to all claims for repayment of monies paid out before May 23, 2012; in favor of Sopko as to the treble damages claim and "as to all claims for repayment except as to the annuity payment of February 15, 2013" and any non-annuity payment paid before May 23, 2012; and in favor of Ohio Farmers on Count VII of the Complaint. Appellant's Appendix Volume II at 43.

## *Discussion*

The issue is whether the trial court erred in entering summary judgment in favor of Pfister, Sopko, and Ohio Farmers. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold*, 756 N.E.2d at 973. Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was

not improperly denied its day in court. *Id.* at 974. In reviewing a grant of summary judgment we face the same issues as the trial court and follow the same process. *Klinker v. First Merchs. Bank, N.A.*, 964 N.E.2d 190, 193 (Ind. 2012). Under Trial Rule 56(C), the moving party bears the burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Id.* If it is successful, the burden shifts to the nonmoving party to designate evidence establishing the existence of a genuine issue of material fact. *Id.*

[22] The State argues that its actions to recover public funds and for treble damages were timely. It contends that the authority of the Attorney General derives only from statutes and that an action to recover public funds, under Ind. Code § 5-11-5-1(a), is not conditioned on the competent and diligent efforts of local governments. It further contends that the Attorney General had no means of discovering the information in the Special Investigation Report until June 8, 2016, when it was first placed with him as required by Ind. Code § 5-11-5-1(a). The State points, in a notice of additional authority, to this Court's recent decision in *Robertson v. State ex rel. Hill* (filed March 29, 2019), Ind. App. No. 18A-PL-1002.[12]

---

[12] By separate order, we grant Pfister and Sopko's March 29, 2019 Motion for Leave to Submit Supplemental Brief Addressing Additional Authority and the State's April 12, 2019 Motion for Leave to File Reply Regarding Notice of Additional Authority. Further, by separate order, we deny Ohio Farmers' November 12, 2018 Motion to Dismiss Appeal as to Ohio Farmers.

[23] The general purpose of a statute of limitations is to encourage the prompt presentation of claims. *Russo v. S. Developers, Inc.*, 868 N.E.2d 46, 48 (Ind. Ct. App. 2007) (citing *Havens v. Ritchey*, 582 N.E.2d 792, 794 (Ind. 1991)). In Indiana, statutes of limitations "are enacted upon the presumption that one having a well-founded claim will not delay in enforcing it." *V. Ganz Builders & Dev. Co., Inc. v. Pioneer Lumber, Inc.*, 59 N.E.3d 1025, 1032 (Ind. Ct. App. 2016) (quoting *Morgan v. Benner*, 712 N.E.2d 500, 502 (Ind. Ct. App. 1999), *reh'g denied, trans. denied*), *reh'g denied, trans. denied*.

[24] Under Indiana's discovery rule, a cause of action accrues, and the limitations period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury. *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009) (citing *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840 (Ind. 1992)). The accrual of a cause of action is a question of law, "as 'it is well-established in Indiana law that it is the courts' responsibility to determine, based on the facts of each case, when the cause of action accrues.'" *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 639 (Ind. Ct. App. 2008) (quoting *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 288 (7th Cir. 1990), *reh'g denied*). For an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred. *Cooper Indus., LLC*, 899 N.E.2d at 1280 (citing *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008)). "A statute of limitations defense is particularly appropriate for summary judgment determination." *V. Ganz Builders & Dev. Co., Inc.*, 59 N.E.3d

at 1032 (quoting *Stickdorn v. Zook*, 957 N.E.2d 1014, 1021 (Ind. Ct. App. 2011)). If the undisputed facts establish "that the complaint was filed after the running of the applicable statute of limitations, the trial court must enter judgment for the defendant." *Martin v. Brown*, 716 N.E.2d 1030, 1033 (Ind. Ct. App. 1999).

[25] Ind. Code § 5-11-1-27(j) (2015), to which Attorney Maicher's letter to the SBOA cited, provides that "[a]ll erroneous or irregular material variances, losses, shortages, or thefts of political subdivision funds or property shall be reported immediately" to the SBOA, and Ind. Code § 5-11-1-27(c) (2011), from which subsection -27(j) originated, provided that "[a]ll erroneous or irregular variances, losses, shortages, or thefts of local government funds or property shall be reported immediately" to the SBOA. (Subsequently amended by Pub. L. No. 184-2015, § 6 (eff. July 1, 2015)). Ind. Code § 34-11-2-6 provides that an action against a public officer "growing out of a liability incurred by doing an act in an official capacity, or by the omission of an official duty, must be commenced within five (5) years after the cause of action accrues." Claims for treble damages brought under the Crime Victims Relief Act ("CVRA") are subject to a two-year statute of limitations. *See Mizen v. State ex rel. Zoeller*, 72 N.E.3d 458, 466 (Ind. Ct. App. 2017) ("It is long settled that 'because the substance of a claim under [the CVRA] is punitive rather than compensatory, such claims are subject to a two-year statute of limitations.'") (quoting *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 638 (Ind. Ct. App 2008)), *trans. denied*.

The State's May 23, 2017 complaint sought to recover funds paid to Pfister and Sopko over a span of approximately thirteen years ending in 2013, pursuant to twenty-seven employment contracts which the School Town entered into beginning in 1998. The record reveals that various members of the Board signed each contract. We note that Swanson, the School Town's Director of Financial Operations and Treasurer, signed Accounts Payable Vouchers each year from 2003 to 2014. From 2000 until 2004, from 2006 until 2007, and from 2009 until 2013, the Board allowed payments to Pfister and Sopko, and examined and approved the relevant Account Payable Voucher Registers – which included the Accounts Payable Vouchers, documents noting the specific amount and salary percentage of the annuity contributions to Pfister and Sopko's accounts, and copies of the checks made to them. We also observe that the SBOA conducted six regular biennial audit examinations of the School Town during this period. We conclude under these circumstances that the causes of action brought against Pfister and Sopko for amounts paid before May 23, 2012, five years prior to the May 23, 2017 complaint filed by the State, are barred by the statute of limitations.

To the extent that the State points to *Robertson* and argues that no claim exists for an action to recover public funds until the SBOA publishes its audit report and finds that a public official has committed malfeasance, misfeasance, or nonfeasance, we find *Robertson* distinguishable. Specifically, we note that *Robertson* involved an interlocutory appeal of a motion to dismiss under Ind. Trial Rule 12(B)(6) and a defendant who "assert[ed] that the . . . claims against

her . . . accrued . . . when the [Office of the Attorney General] received a copy of the preliminary report from the SBOA," and that this Court observed in a footnote that she did not argue that the discovery rule did not apply to her case. *Robertson*, slip op. at 3. *See id*. at 3 n.6 ("Robertson also briefly asserts that the claims against her accrued . . . [during] the time period when she was employed as a bookkeeper in the Clerk's Office. However, Robertson does not cite any authority to support her contention nor does she argue that the discovery rule does not apply.").

[28] To the extent that the State maintains that Ohio Farmers is liable for the policy amounts of Policy Nos. 1 and 2 and Policy No. 2 Renewal to cover allegations regarding Pfister if it were to prevail in its claims against him, and argues that the policies qualified as public bonds "notwithstanding the requirements of Indiana Code section 5-4-1-18," we note that the cases to which the State cites do not stand for the proposition that a loss discovery period contained in a "crime insurance policy" under Ind. Code § 5-4-1-18(d) is against public policy. Appellant's Brief at 27. We observe that Ind. Code § 5-4-1-18 required, during the relevant periods, that "[t]hose employees directed to file an individual bond by the fiscal body" of a city, town, or county shall file one, except for as provided in a relevant subsection which stated that the fiscal body of a city, town, county, or township "may by ordinance authorize the purchase of . . . a crime insurance policy," *see* Ind. Code § 5-4-1-18 (1996) (subsequently amended by Pub. L. No. 28-2004, § 56 (eff. July 1, 2003); Pub. L. No. 146-2008, § 34 (eff. July 1, 2008)), and that the State does not point to the record to indicate that

these requirements were met. The period for Policy No. 2 Renewal expired on July 1, 2008, and the complaint against Ohio Farmers was brought in 2017. Under these circumstances, we conclude that the court did not err in granting summary judgment in favor of Ohio Farmers.

[29] For the foregoing reasons, we affirm the trial court's entry in favor of summary judgment of Pfister, Sopko, and Ohio Farmers.

[30] Affirmed.

May, J., and Mathias, J., concur.